# HEATH & MILLIGAN MANUFACTURING COMPANY v. WORST.

## APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF NORTH DAKOTA.

No. 41. Argued November 7, 8, 1907.—Decided December 9, 1907.

It is within the power of the State to prevent the adulteration of articles and to provide for the publication of their composition.

Legislation which regulates business may well make distinctions depend upon the degrees of evil without being arbitrary, unreasonable, or in conflict with the equal protection provisions of the Fourteenth Amendment to the Federal Constitution. See *Ozan Lumber Co.* v. *Union County Bank*, *ante*, p. 251.

This court will not limit the power of the State by declaring that because the judgment exercised by the legislature is unwise it amounts to a denial of the equal protection of the laws or deprivation of property or liberty without due process of law.

The statute of North Dakota requiring the manufacturers and vendors of mixed paints to label the ingredients composing them is not unconstitutional as depriving such manufacturers of their property or liberty without due process of law or as denying them the equal protection of the law because the requirements of the statute may not apply to paste paints.

THIS is a direct appeal from the Circuit Court for the District of North Dakota, sustaining the constitutionality of a statute of that State, requiring the manufacturers of mixed paints to label the ingredients composing them.

The statute is as follows:

"An Act to prevent the adulteration of and deception in the sale of white lead and mixed paints.

"*Be it enacted by the Legislative Assembly of the State of North Dakota:* 1. Every person, firm or corporation who manufactures for sale or exposes for sale, or sells, within this State, any white lead, paint or compound intended for use as such, shall label.

the same in clear and distinct open gothic letters upon a white background and show the true per cent of each mineral constituent contained in said paint, or if other than linseed oil is used in its preparation, the names of such oils or substitutes shall be shown together with the percentage thereof, and every person, firm or corporation who manufactures for sale, or exposes for sale or sells within this State any mixed paint or compound intended for use as such, which contains any ingredient other than pure linseed oil, pure carbonate of lead, oxide of zinc, turpentine, Japan dryer and pure colors, shall be deemed guilty of a misdemeanor and upon conviction thereof shall, for each offense, be punished by a fine of not less than twenty-five and not more than one hundred dollars and costs, or by imprisonment in the county jail not exceeding sixty days; provided, that any such person, firm or corporation who shall manufacture for sale or expose for sale, or sell within this State any white lead, paint or mixed paint containing ingredients other than those as above enumerated, shall not be deemed guilty of a violation of this act in case the same be properly labeled showing the quantity or amount of each and every ingredient used therein and not specified above, and the name and residence of the manufacturer or person for whom it is manufactured."

It is made the duty of the appellee in his official capacity to enforce the statute. A few days before the statute took effect (January 1, 1906) the appellants filed a bill to restrain its enforcement, and prayed a preliminary as well as a permanent injunction. A preliminary injunction was granted. It was dissolved on final hearing, and a decree was entered dismissing the bill for want of equity.

The grounds of attack upon the statute are that it offends against the Fourteenth Amendment of the Constitution of the United States, in that it deprives appellants of their property and liberty without due process of law, and denies them the equal protection of the laws. How it is contended the statute produces these effects will be pointed out hereafter.

The stress of the case is upon paragraph 17 of the bill and the special paragraphs "A" and "B". To these paragraphs an answer was filed. The legal effect of the others was submitted upon demurrer. Upon the issue of fact formed by the answer to paragraph 17 and the special paragraphs, testimony was taken, and upon it and the demurrer to the other allegations, and the affidavit of one Professor Ladd, the case was submitted.

The bill is voluminous. It alleges that the plaintiffs are manufacturers of mixed paints and sell their respective products in North Dakota, and that each "had established an enviable reputation for its goods;" that each sold in North Dakota mixed paints containing ingredients other than those specified in the statute, which is set out. It is alleged that mixed paint has an absolutely defined meaning in the trade, and means a paint so thinned, "by admixture of the proper liquid vehicles, as to reduce it to a consistency which makes it ready for use." The term "mixed paint," it is alleged, is used in contradistinction to "a paste paint," which paint has also a well defined meaning, meaning a paint ready for use, except that it requires thinning material to give it the necessary consistency. White lead, it is alleged, is a commercial, not a scientific term, and is commonly understood to be a dry powder consisting of commercial carbonate of lead. When ground in oil to a paste consistency it is commonly called in the trade white lead in oil, colloquially referred to frequently as "white lead." In the statute these terms are used interchangeably, and are intended to denote white lead in oil, as above defined. That various compounds containing no carbonate of lead or other ingredients in addition to carbonate of lead are frequently sold in the market labeled as "white lead." And that the words " any white lead paint, or compound intended for use as such," in the act " are intended to denote a paste paint, intended as a substitute for white lead and labelled or sold as 'white lead' or 'white lead in oil,' but which does not contain any carbonate of lead or contains other ingredients in addition thereto."

Paragraph 17 is as follows:

"Your orators further show unto your honors that the manufacture of paint, and more particularly of mixed paint, involves many practical problems, the proper solution of which demands the application of a variety of scientific principles and is the result of a great variety of practical tests and experiments; that the means, methods and processes employed in said manufacture have changed materially in the course of years to conform to the discovery of new scientific facts and the results of practical experiments; that the technology of paint manufacturing has made gradual and constant progress during the last fifty years, during which time it has undergone an evolutionary process which is still far from completed; that until about twenty-five years ago carbonate of lead was the only material which was universally conceded by manufacturers and users of paint to be a proper pigment to be used in paints requiring or admitting of the use of a white pigment; that since said time, and within the last twenty-five years, oxide of zinc gradually gained recognition among manufacturers and users of paint as being equally appropriate for the purposes for which theretofore carbonate of lead had alone been recognized as appropriate, and has come to be universally conceded as possessing important useful qualities as a white pigment not possessed by carbonate of lead; that within the last fifteen years practical experiments and tests, made with a view to widening the range of white pigments properly usable in the manufacture of paint, have demonstrated the following facts, which are now conceded by the most advanced and most successful paint manufacturers of the world, viz:

"a. That there are materials other than carbonate of lead and oxide of zinc which in some cases may be used in connection therewith and in other cases may be used instead thereof, and which, either without carbonate of lead or oxide of zinc, or in connection with one or both of these, according to circumstances, are as efficient as, and in some respects more efficient than, carbonate of lead or oxide of zinc, or a combination of

the two for the purposes for which the latter are used in paint; that among said materials are (a) sublimed lead (which is an artificial product consisting of sulphate of lead and oxy-sulphate of lead), (b) standard zinc lead white (which is commonly called zinc lead and is an artificial product made by the United States Smelting Company and sold in large quantities, and consists of a combination of sulphate of lead and oxide of zinc united by a furnace process), (c) zinc made from Western ores, which carries in its natural composition varying proportions of sulphate of lead and oxide of zinc, and (d) an artificial opaque white pigment, consisting essentially of zinc sulphide, zinc oxide and barium sulphate, which is known to the paint manufacturing trade under various trade names, such as lithopone, ponolith, lithophone, charlton white, becton white and Orr's white.

"b. That there are certain white pigments other than carbonate of lead and oxide of zinc which constitute proper and useful ingredients of paints, and which, if so used in connection with carbonate of lead or oxide of zinc, or a combination of the same, or in connection with one or more of said other materials described in the last preceding paragraph as proper substitutes for carbonate of lead and oxide of zinc, furnish to the paint wherein used important useful qualities not possessed by either carbonate of lead or oxide of zinc, or any of said substitutes therefor; that among said other pigments are sulphate of barium, silica, silicate of magnesia, calcium carbonate, hydrated sulphate of lime, and others; that the proportionate amount of the pigments last named which may properly and usefully be made an ingredient of paint, and whether any of them may be properly used as such ingredient depends upon a great variety of conditions and circumstances, but all of said pigments may, under proper conditions, serve a highly useful purpose and where properly used do essentially increase the durability and density of the paint."

It is further alleged that the statute in condemning inferentially the use of the materials mentioned in paragraph 17, and

its sub-paragraphs, "as ingredients of mixed paint and branding them as adulterants, ignores the fact that all said substances constitute proper, useful and necessary ingredients of paint, is based upon antiquated, obsolete and quite generally discarded prejudices regarding the ingredients proper, useful and necessary to be used in paint, and is therefore unreasonable and void."

That complainants and most of the successful paint manufacturers of the United States have for many years maintained and continue to maintain, in connection with their factories, chemical laboratories, wherein are able, accomplished chemical experts, who are constantly conducting experiments in the qualities and properties of new ingredients to produce the best results regarding the purposes of paint, the materials upon which it is used and the various conditions to which it may be exposed. And that the business success of such manufacturers largely depends upon the efficiency of said laboratories and experiments, "and their readiness and ability to conform their methods of manufacturing to the truths discovered by said investigations and tests." That such experiments have led to the adoption of improved methods of manufacture and the use of a widening range of ingredients and a constantly increasing degree of efficiency in the paint produced, and if continued "is sure to bring about a still higher and gradually increasing degree of merit and efficiency in the paint of the future."

Other allegations of the bill set forth the virtues and usefulness of varnish as a vehicle or thinning material of mixed paint in connection with or in place of one or other of the ingredients of the statute for some purposes and situations, and that the statute by excluding it brands it as an adulterant, and is hence void. The bill also charges the statute with inaccuracy in its designation of pure carbonate of lead as one of the ingredients of mixed paint specified, and alleges that it cannot be used for the purpose of manufacturing paint, and that the carbonate of lead, which is commonly used and has been used from time immemorial, even in paints of the higher grade, contains

approximately twenty to thirty per cent of other ingredients. It is hence charged that the statute, by specifying "pure" carbonate of lead, and prohibiting as a crime the use of commercial carbonate of lead, "without specifying on a label quantity or amount of each of its ingredients is unreasonable and void." The bill also attacks with much detail the term "pure colors" in the enumeration of the ingredients by the statute, alleges that such term neither has a definite meaning among the manufacturers of such coloring material nor among manufacturers of paint, nor is it capable of an exact or even an approximately exact definition; that there is no line of demarkation between pure and impure colors; that while some dry colors are regarded as "pure" and others "impure" by some manufacturers, there is nothing approaching a consensus of opinion upon the subject, and no rational classification has been attempted; that the standard universally applied to dry colors is not purity but efficiency; that, with the exception of a very few dry colors of limited use in mixed paints, even the very highest and most expensive grades made or imported contain large and widely varying percentages of elements which have no coloring properties. Illustrations are given, and the bill charges "that said act, in specifying 'pure colors' among the ingredients of mixed paint, and making the use of any but 'pure colors' as such ingredient a crime, unless the manufacturer or dealer stigmatizes the paint by a label as required in said act, is so uncertain and unreasonable as to be void."

It is also alleged that the only purposes for which paint is used is to preserve and beautify, and that that paint is most efficient which accomplishes those purposes for the longest time, and that any ingredient which tends to such ends is a proper ingredient; that there is no natural standard of the purity of paint, nor a widely accepted standard; that any enumeration of allowable ingredients, short of an exhaustive enumeration of ingredients, which may under particular circumstances and conditions give to paint a useful quality, is necessarily unjust and unreasonable, and even such enumera-

tion, though just to-day, by discoveries may be unjust to-morrow; that to produce an efficient paint not the ingredients alone must be considered, but the manner and the proportion of every combination and the purpose and conditions of the use of the paint; that it is, therefore, impossible to speak of a standard of purity as applied to paint, "nor is it reasonable for any statute to attempt to set up a standard of efficiency of paint by an enumeration of allowable ingredients, the only test of the efficiency of paint being its ability to serve the purposes for which it is intended."

It is further alleged that the requirement of the statute "is intended and calculated to create in the minds of the mixed paint dealers and consumers in the State of North Dakota the erroneous belief that all ingredients of mixed paint other than those specified in said act are adulterants used for the purpose of cheapening the product, and add no quality of usefulness or efficiency to the mixed paint wherein they are used; that said act in requiring mixed paint containing any ingredients other than those specified in said act as aforesaid, to be labelled as aforesaid, is a requirement that the manufacturer of and dealer in such paint shall brand the same in such a way as to hold it up to the suspicion and prejudice of the users of mixed paint, and thereby make the sale thereof in said State, if not impossible, at least more difficult and expensive."

That the excluded ingredients (they are enumerated in the bill) will have no tendency by their use to render "mixed paint by those applying the same harmful to health in any sense or degree." That while such act was intended as a police regulation for the prevention of fraud, its provisions are such that it has no tendency to accomplish such end; that the act, by failing to specify the maximum and minimum of the proportionate amount of the ingredients specified, permits the manufacture and sale of mixed paint containing those ingredients in such proportions as to make it absolutely inefficient and useless and a fraud upon the purchaser; that by holding up to the prejudice of dealers in and users of other mixed paint has the ten-

dency, in. many instances, to give inferior brands a preference over superior brands of mixed paint. And that such act has no tendency to accomplish the prevention of fraud, because it does not prevent the manufacture and sale "of any imaginable paint concoction in paste form," or impure linseed oil, or any spurious article, as "white lead," or "white lead in oil," or as "white lead paint," because a paint ready for use may be lawfully made of such concoctions and substitutes; "that the manufacture and sale of paste paint is a substantial part of the paint manufacturing and selling business of the United States; that millions of dollars worth of white lead in oil and compounds intended as substitutes therefor are annually manufactured and sold in the United States; that tinting colors for use as an ingredient of paint are manufactured in large quantities and sold in cans, in paste form, throughout the United States; that linseed oil, as such, is an article of commerce throughout the United States;" and that the statute, by failing to place restriction on the manufacture or sale of such paint and material, but imposing penalties and restrictions on the manufacturers of mixed paint, unjustly discriminates against the latter, and, for the same reason and "the other facts and circumstances" stated in the bill, they will be deprived of their property without due process of law.

It was also alleged that each of the complainants' manufactures "scores of different kinds and shades of mixed paints, differing from each other in chemical composition; that even the same kind and shade of mixed paint manufactured by any one of your orators has no fixed chemical composition, but varies in such composition from time to time and practically with each lot manufactured, by reason of the wide variations in the chemical composition of the constituent ingredients, more especially the chemical composition of the dry colors used; that in order to properly label the cans of mixed paint manufactured by your orators and sold in North Dakota showing 'the quantity or amount of each and every ingredient used therein, and not specified' in said act, each of your orators

would have to have a chemical analysis made of each lot of mixed paint before putting the same up in cans or other containers." It is alleged that this would add materially to the cost of manufacture of mixed paints, cast a burden upon them, from which the manufacturers of other paints are free, and would deprive them of their property without due process of law.

It is further alleged that there are dealers in North Dakota who have on hand stock of mixed paint subject to the act and who will be subject to criminal prosecution unless the cans containing the same be opened and analyzed and labelled, which opening would make the paint unsalable; that dealers who in the future shall purchase from any of the complainants, and the distributing agents and salesmen of complainants, will be subject to criminal prosecution, that thereby a multiplicity of criminal prosecutions will ensue and suits to enforce payments for paints sold or to be sold. And if the complainants should label the mixed paints manufactured by them as required by the act they would not only be subject to the expense thereof, but that their products will be held up to suspicion and prejudice of the dealers in and users of the same, which will make it either impossible or more difficult and expensive to sell their products in said State, all of which will produce incalculable and irreparable injury to complainants; that the dealers in paints who are now subject or may be subject to prosecution under such act will not have sufficient interest to or can successfully raise the defense of the invalidity of the act, "inasmuch as such defense involves the consideration of the complex state of facts hereinbefore set forth."

Fear is expressed that most of such prosecutions will result in conviction, and that by such the brands of mixed paints involved therein will be branded as adulterated and illegal products, and will thereby be rendered unsalable, all of which will produce incalculable and irreparable injury to complainants, and will constitute the taking of their property without due process of law and the denial to them of the equal protection of the laws.

It is difficult to separate the admissions and denials of the answer to paragraph 17. It admits that practical problems are involved in the manufacture of paints, particularly of mixed paints, the solution of which is the result of a variety of practical tests and experiments; "that the technology of paint manufacture has made gradual and constant progress during the past fifty years, during which time it has undergone an evolutionary process." It admits that formerly carbonate of lead was the only material which was universally used as the proper pigment used in paints requiring or admitting of the use of a white pigment, and that oxide of zinc has gained recognition as in many cases appropriate as a white pigment, but denies that such recognition has come within the last twenty-five years; on the contrary, asserts it has been recognized and used for a period of thirty years. Admits that there are materials other than carbonate of lead and oxide of zinc used in connection with the latter or instead of them, but denies their equal efficiency; on the contrary, alleges that tests and experiments have not determined or demonstrated the value and usefulness of such materials, and further alleges that their use and value have not progressed beyond the experimental stage. That about one-half of the leading manufacturers entirely reject them, or reject them because upon test they have proved to be unsatisfactory and inefficient, and others that time has not yet demonstrated their value. Admits that zinc made from Western ores is valuable and efficient as a pigment, provided sulphate of lead incidental to its production does not exceed in quantity 5 per cent of its constituent elements, and alleges that the percentages of the sulphate of lead are widely different.

The answer to sub-paragraph "b" of paragraph 17 admits that in making the colored paints there mentioned it is necessary to employ some of the articles mentioned in connection with some pigment other than carbonate of lead; and that the latter would change or modify the exact shades sought to be produced. But it is alleged on information and belief that the aggregate of all mixed paints produced, sold and consumed in

North Dakota, in the preparation of which it is necessary to exclude carbonate of lead and to include one or more of the substituted materials mentioned in the bill, does not exceed 25 per cent of the aggregate of all mixed paints which may be prepared and produced by the use alone of carbonate of lead and oxide of zinc as pigments. Save as to those admitted, the answer denies the efficiency of the materials mentioned, and avers that the general use of them is "to cheapen and adulterate the paints wherein they are employed," and of all substances known they are best adapted and lend themselves most readily and are commonly used as adulterants to cheapen mixed paints. It is further averred that 70 to 75 per cent of the paints used in the State are mixed paints, and that their adulteration has become and is a great evil. "That no other substances have been discovered or known, which, by their inherent qualities, lend themselves so readily to or are so commonly employed for such purpose of fraud and deception as those described in said sub-paragraph 'b.' "

Mr. *Sigmund Zeisler,* with whom *Mr. Henry L. Stern* was on the brief, for appellants:

Corporations are persons within the provisions of the Fourteenth Amendment. *Gulf, C. & S. F. R. Co.* v. *Ellis,* 165 U. S. 150, 154.

The classification, though ostensibly between paints, is in reality between paint manufacturers. *Connolly* v. *Union Sewer Pipe Co.,* 184 U. S. 540.

The exercise of the police power must be reasonable. The question of the reasonableness of a state statute ostensibly passed in the exercise of the police power is a judicial question. *Mugler* v. *Kansas,* 123 U. S. 623, 661; *Lake Shore & M. S. R. Co.* v. *Ohio,* 173 U. S. 285, 301; *Wisconsin, M. & P. R. Co.* v. *Jacobson,* 179 U. S. 287, 301; *Dobbins* v. *Los Angeles,* 195 U. S. 223, 235; *Lawton* v. *Steele,* 152 U. S. 133, 137; *Holden* v. *Hardy,* 169 U. S. 366, 395; *Gulf, C. & S. F. R. Co.* v. *Ellis,* 165 U. S. 150; *Lochner* v. *New York,* 198 U. S. 45; *Chicago, B. & Q.*

*R. Co.* v. *Illinois*, 200 U. S. 561, 592; *Lake Shore & M. S. R. Co.* v. *Smith*, 173 U. S. 684; *Long* v. *Maryland*, 74 Maryland, 565.

While every intendment is to be made in favor of the lawfulness of the exercise of this power, the courts will not imagine the existence of some undisclosed and unknown reason for its exercise. The simple decision of the legislature cannot be held to constitute such reason. *Lake Shore & M. S. R. Co.* v. *Smith*, 173 U. S. 684, 699; *Dobbins* v. *Los Angeles*, 195 U. S. 223, 237; *Gulf, C. & S. F. R. Co.* v. *Ellis*, 165 U. S. 150, 154; *Lochner* v. *New York*, 198 U. S. 45, 56.

A statute ostensibly passed in the exercise of the police power must be judged by its natural effect and not by its proclaimed purpose.

A statute which restrains the liberty or property rights of individuals, though ostensibly passed in the exercise of the police power, cannot be held valid, unless it has a real or substantial relation to some legitimate object of the police power which its provisions reasonably tend to accomplish. *Lochner* v. *New York*, 198 U. S. 45, 64; *Mugler* v. *Kansas*, 123 U. S. 623, 661; *C., B. & Q. R. Co.* v. *Illinois*, 200 U. S. 561, 593; *Gulf, C. & S. F. R. Co.* v. *Ellis*, 165 U. S. 150.

Even if a statute is fairly referable to the police power of the State, still if it impairs or destroys a right secured by the Federal Constitution, it is invalid. *Connolly* v. *Union Sewer Pipe Co.*, 184 U. S. 540, 558.

In making regulations, providing penalties or imposing liabilities in the exercise of the police power, the legislature has the right to make classifications. But classification must have some reasonable basis. The differences which will support class legislation must be such as in the nature of things furnish a reason for separate laws. The differences must bear a reasonable relation to the purpose of the statute. Arbitrary designation or selection is not classification. When burdens are placed upon some and not upon others similarly situated with respect to the purpose for which such burdens are imposed, the classi-

fication is arbitrary and illegal. Cases *supra* and *Soon Hing* v. *Crowley,* 113 U. S. 703, 709; *Barbier* v. *Connolly,* 113 U. S. 27; *Cotting* v. *Kansas City St. Yds. Co.,* 183 U. S. 79; *Luman* *. *Hitchins Bros. Co.,* 90 Maryland, 14; *Missouri* v. *Ashbrook,* 154 Missouri, 375; *State* v. *Julow,* 129 Missouri, 163; *Bailey* v. *The People,* 190 Illinois, 28.

The liberty guaranteed by the Fourteenth Amendment embraces the right of the citizen to be free in the enjoyment of all his faculties; to be free to use them in all lawful ways. *Allgeyer* v. *Louisiana,* 165 U. S. 578.

To enjoy the privilege of pursuing an ordinary calling or trade upon terms of equality with all others in similar circumstances, is an essential part of the rights of liberty and property as guaranteed by the Fourteenth Amendment. *Powell* v. *Pennsylvania,* 127 U. S. 678, 684; *People* v. *Hawkins,* 157 N. Y. 1; *Bailey* v. *People,* 190 Illinois, 28, 35.

Any law which, without a valid reason, annihilates the value of property, restricts its use or takes away any of its essential attributes by imposing onerous conditions upon the right to hold or sell it, deprives its owner of property without due process of law. To require a label upon some mixed paints while exempting others, is not only to burden them with peculiar expense, but also to require them to bear a badge of inferiority which diminishes their value and impairs their selling qualities. *People* v. *Hawkins,* 157 N. Y. 1.

To restrict one's freedom of competition upon equal terms with others in the same business is prohibition. *Brimmer* v. *Rebmann,* 138 U. S. 78.

The Fourteenth Amendment forbids that any impediment be interposed by a state statute to the pursuits of any one except as applied to the same pursuits by others standing in the same relation to the purpose of the statute. *Barbier* v. *Connolly,* 113 U. S. 27; *Soon Hing* v. *Crowley,* 113 U. S. 703; *Connolly* v. *Union Sewer Pipe Co.,* 184 U. S. 540; *Gulf, C. & S. F. R. Co.* v. *Ellis,* 165 U. S. 150; *Cotting* v. *Kansas City St. Yds. Co.,* 183 U. S. 79.

*Mr. John S. Watson,* with whom *Mr. T. F. McCue,* Attorney General of the State of North Dakota, was on the brief, for appellee:

Assuming that the act sets up a standard of purity or efficiency and puts the paint containing substituted pigments at a disadvantage by requiring a label, it is yet constitutional, because the classification is warranted by the situation disclosed in the record.

The act, the validity of which is drawn in question, in fact makes no discrimination for or against complainants. It establishes no standard of purity or efficiency. It deals with carbonate of lead and oxide of zinc, with which all are familiar, by saying that all persons, firms and corporations employing them as pigments in the preparation of mixed paints may do so without labeling the product.

If the act does not include paste paint (which we do not admit) such omission goes only to the completeness of the law, to its failure to deal with the whole subject. It does not render it unconstitutional. Complainants may, like all others, sell unlabeled paste paint of whatever ingredients composed.

It is enough if the law has some tendency to accomplish the desired end. *Powell* v. *Pennsylvania,* 127 U. S. 678.

The act in question is well calculated to prevent the perpetration of fraud. It enables intending purchasers to know what they are buying. It prevents dishonest manufacturers from palming off upon the public cheaper substances for more expensive ones. It puts every substance used as an ingredient upon its own distinctive merits or lack of them, and prevents the inferior article from being sold for what it is not. The class "B" pigments are the substitutes most extensively used for, and which by their inherent character lend themselves most readily to, the adulteration of mixed paints. The record abundantly substantiates the foregoing statements.

The police power of the State embraces its whole system of internal regulation and is as broad and plenary in its effect as the taxing power itself. It embraces all regulations designed

to promote the public convenience or the general prosperity as well as those intended to promote the public health or the public morals or the public safety.   Cooley's Const. Lim., p. 829 (7th ed.); *Kidd* v. *Pearson,* 128 U. S. 1; *R. R.* v. *People,* 200 U. S. 561; *Crossman* v. *Lurman,* 171 N. Y. 329; *Schollenberger* v. *Pennsylvania,* 171 U. S. 1; *Lawton* v. *Steele,* 152 U. S. 133.

   The police power will be upheld for the prevention of fraud or deception upon the public and to promote fair dealings. *Schollenberger* v. *Pennsylvania, supra; Plumley* v. *Massachusetts,* 155 U. S. 461; *State* v. *Snow,* 81 Iowa, 642; *State* v. *Aslesen,* 50 Minnesota, 5; *State* v. *Hanson,* 84 Minnesota, 42.   See also *Capital City Drug Co.* v. *Ohio,* 183 U. S. 238.

   MR. JUSTICE McKENNA, after making the foregoing statement of the case, delivered the opinion of the court.

   It appears from the evidence that the statute which is assailed by appellants was one, among others, passed to prevent the adulteration of articles or to provide for the publication of their composition.   That both purposes are within the competency of the State can hardly be denied.   A discrimination is, however, asserted to have been made in the exercise of the power, with the following results: (1) The imposition of the burden of analyzing and labelling the ingredients of mixed paints, from which burden the manufacturers of paste paint and manufacturers of mixed paints containing only the ingredient specified in the act are to be free.   (2) Holding up to the prejudice of dealers in and users of mixed paints containing ingredients other than those specified, branding them as suspicious or adulterated, and rendering them unsalable or less salable than mixed paints containing the statutory ingredients, though more efficient than the latter for certain purposes.   We can see that expense will be cast on the manufacturers of mixed paint not containing ingredients enumerated in the statute, but that such paint will be branded as adulterated is not easy to accept, and seems to be opposed by other allegations in the

bill. It is averred that the complainants have a yearly increasing trade in the State of North Dakota which has attained to many thousands of dollars per annum, and that by the high quality of their goods and by advertising they have attained an enviable reputation for them. How the firmness and profit of that trade, how the excellence and degree of that reputation, can be affected by revealing the composition of the goods, is not by us discernible. Manufacturers who use inferior materials because they are so or from a mistaken opinion of their quality, though they have statutory sanction, would be more affected than complainants. Consumers of paint, we may assume, like the consumers of other kinds of goods, seek excellence in them, and where excellence is demonstrated by use will care little of what pigments it is composed. This, however, is anticipating somewhat, and we will pass to the statute, consider its purpose and see whether its classification is justified by that purpose.

We will omit from citation the cases in which this court has passed upon the power of the States to classify objects for the purpose of government. A review of them is not necessary in this case. Counsel have collected and analyzed them, applied or rejected them as they have thought they supported or opposed their respective contentions. We have declared many times, and illustrated the declaration, that classification must have relation to the purpose of the legislature. But logical appropriateness of the inclusion or exclusion of objects or persons is not required. A classification may not be merely arbitrary, but necessarily there must be great freedom of discretion, even though it result in "ill-advised, unequal and oppressive legislation." *Mobile Co.* v. *Kimball*, 102 U. S. 691. And this necessarily on account of the complex problems which are presented to government. Evils must be met as they arise and according to the manner in which they arise. The right remedy may not always be apparent. Any interference, indeed, may be asserted to be evil, may result in evil. At any rate, exact wisdom and nice adaptation of remedies are not required by

the Fourteenth. Amendment, nor the crudeness nor the impolicy nor even the injustice of state laws redressed by it.

Keeping these principles in mind, let us examine the North Dakota statute. Its purpose, as expressed in the title, is "to prevent the adulteration of and deception in the sale of white lead and mixed paints." It attempts to accomplish this purpose by the following requirements: (1) All white lead and compounds intended for use as a substitute therefor must be labelled to clearly show the per cent of each mineral therein. (2) All mixed paints must show their true composition, unless made of pure linseed oil, carbonate of lead or oxide of zinc, turpentine, Japan dryer and pure colors. (3) All substitutes for linseed oil in the preparation of paints must be clearly shown on the label.

The second and third divisions we are concerned with in this case, and it is insisted their requirements work a discrimination between mixed paints which contain and those which do not contain any ingredients other than those specified. It will be observed that the manufacture for sale and the selling of the first kind is made a misdemeanor unless the paint be labelled as required by the statute. The manufacture or sale of the other kind is free from such consequence or condition. It is also charged that the statute discriminates between mixed paints and paste paints, it being asserted that the latter, no matter what their ingredients, need not be labelled. To this charge we may immediately answer that it is open to contest whether the act exempts paste paint from its requirements, and the executive officers of the State have construed it as not exempting them. But be this as it may, there is a distinction between the paints, and the evils to which the statute was addressed may not exist or be as flagrant in one as in the other. There, indeed, may be a degree of competition between them, but other circumstances and conditions may have directed the legislative discretion. This record certainly does not present any data to make it certain that the discretion was arbitrarily exercised. Legislation which regulates business

may well make distinctions depend upon the degrees of evil without being arbitrary or unreasonable. *Ozan Lumber Co.* v. *Union County National Bank et al., ante,* page 251.

2. The argument which attacks the discrimination between mixed paints is an elaboration of paragraph 17 of the bill. It is able, circumstantial and variously illustrated. It has been given careful consideration, but it would extend this opinion too much to answer it in detail or review its specifications. It is ultimately grounded on the contention that the pigments enumerated in the statute, and hence denominated statutory pigments, are not more efficient—maybe not as efficient to the manufacture of paint, either in themselves or as depending upon the particular use to which paint may be put, the proportion of ingredients varying with such use, or even with the fancy or taste of the user, or the atmospheric conditions to which paint may be exposed, as the pigments mentioned in sub-paragraphs "A" and "B" of paragraph 17, and hence called class "A" and class "B" pigments. And, it is contended, that there is, "neither a standard of purity nor a general or widely accepted standard of purity," and that the statute, by making a standard of some ingredients and excluding others "useful, efficient, harmless and in some cases most essential," is an arbitrary discrimination and an improper exercise of the police power of the State, not justified by the comparative newness of the excluded ingredients, or because they are not used by unprogressive manufacturers, or used by unscrupulous ones in excessive proportions to cheapen their products. And this, it is urged, is all that is established against such ingredients. Besides, it is further urged, the charge that they are used to cheapen paint is true of one of the statutory ingredients.

The claims for class "A" and "B" pigments are controverted, and if they are sustained at all are sustained upon the balancing of and the judgment between the testimony of experts, certain publications and exhibits. But a problem of a different kind was presented to the legislature of North Dakota. It was not what scientific men might find out by chemical and laboratory

tests, or progressive men might discover by practical experiments, but what the people of the State could find out or be justified in accepting as established. It was the experience of the people, not the acts of some progressive manufacturers, which directed the legislation, and it was to protect the people, when following the opinions formed from that experience, from deception, that the statute was enacted. It may be that the purpose could have been accomplished better in some other way. It may be that it would have been more entirely adequate, let us say, even more entirely just, to have required that all paint should be labelled, the statute nevertheless cannot be brought under the condemnation of the Fourteenth Amendment. Legislatures, as we have seen, have the constitutional power to make unwise classifications. But we may be going too far in concession to the argument of appellants. The legislature of North Dakota may have met the evils which exist as best it could, and there is a strong presumption that it did. At any rate, a fair question was presented, whether to take as a standard the ingredients that years of use had demonstrated as excellent or make regulation universal. We think it would be limiting the power of the State too much to say that a judgment exercised under such circumstances must be condemned as denying the equal protection of the laws or that the liberty assured by the Constitution of the United States in the Fourteenth Amendment gives a right to either progressive or conservative tendencies in legislation.

Appellants not only attack the standard adopted by the statute, but attack the use made of it. They assert that the standard is of "purely negative character," in that it fails to "require all allowable ingredients essential for efficiency to be used and its failure to prescribe maximum and minimum percentages," and, therefore, it is insisted, "permits of the manufacture and sale under the special sanction of the law of that which is inefficient, useless and a fraud upon the purchaser." It is besides asserted that the statute enumerates among the allowable ingredients a material which cannot be used, to wit,

pure carbonate of lead, and it is asked whether a statute having these effects can be a valid exercise of the police power of the State. The answer is ready enough. The enumeration of "pure carbonate of lead" may be corrected into commercial carbonate by a perfectly allowable exercise of construction; and as to the other charge, the inefficiency of the statutory ingredients on account of the failure to define the proportions in which they must be used, goes to the defect or incompleteness of the legislation, not to its legality. Were the proportions ever so exactly defined, the relation of mixed paints to the resultant product or its liberty of sale or power of competition would not be lessened.

There is a special and earnest criticism of the provision of the statute requiring varnish when used as a thinning material to be specified, and a like criticism of the term "pure colors." to designate one of the statutory ingredients. "The exclusion of varnish," it is said, "from the list of allowable ingredients is indefensible and undefended." The bill alleges, and it is not denied, that there is very large demand for certain mixed paints, which are enumerated, that are capable of producing a high gloss for decorative purposes and have high resisting power to moisture, and that varnish is the "only thinning material now known which may appropriately be used as an ingredient of mixed paint to produce said effects." "Notwithstanding these admitted facts," counsel's comment is. "varnish is branded as an adulterant by the statute."

The term "pure colors," it is alleged, is intended to refer to coloring material used by paint manufacturers in powdered form, and is known in the trade as "dry colors;" that the term "pure colors" neither has a definite meaning nor is "it capable of an exact or even approximately exact definition;" that some dry colors are regarded as "pure" and others "impure" by individual manufacturers, but there is "nothing approaching a consensus of opinion," and "no rational classification on the subject has ever been attempted." The standard "applied to dry colors is not purity but efficiency."

We regard these criticisms answered by our general discussion, and we have specially noticed them that it may not be thought we have overlooked them. They may emphasize what we have already said as to the possible imperfection of the classification of the statute. It must not be forgotten, however, that inaccuracies of definition may be removed in the administration of the law. And it must be borne in mind that the use of the non-enumerated ingredients is not forbidden nor the advantages of the practical tests and scientific research made by appellants taken away from them. The sole prohibition of the statute is that those ingredients shall not be used without a specific declaration that they are used—a burden maybe, but irremediable by the courts—maybe, inevitable, in legislation directed against the adulteration of articles or to secure a true representation of their character or composition.

*Decree affirmed.*