LORENCE R. FREADRICH ET AL. V. STATE OF NEBRASKA.

FILED MAY 23, 1911.   No. 16,989.

1. Food: SALES: MARKING WEIGHT ON PACKAGES.   A corporation, whose
principal business in manufacturing and selling a certain food
product in package form is at wholesale, *held*. not to be exempted
from the requirement of the statute as to marking the weight or
measure of the net contents of the package on the label by reason
of the fact that it also maintains at its packing house a retail
store at which it sells packages of the same nature at retail to
consumers.

2. Constitutional Law: "PURE FOOD LAW."   An act of the legislature
which in effect places persons who manufacture and sell, or who
sell either at wholesale or retail, certain specified food products
in package form, not put up by retailers, in one class, and re-
tailers who put up and sell the same products in package form
themselves in another class, and provides that such foods sold in
package form, not put up by the retailer, shall bear a printed
label showing net weight or measure of the contents, does not de-
prive one who sells a "misbranded" package of the equal protec-
tion of the laws, and is not violative of the fourteenth amend-
ment to the constitution of the United States.

ERROR to the district court for Lancaster county:
WILLARD E. STEWART, JUDGE.   *Affirmed.*

*T. J. Mahoney* and *J. A. C. Kennedy*, for plaintiffs in
error.

*Grant G. Martin, Attorney General*, and *Frank E.
Edgerton, contra.*

LETTON, J.

Defendant was convicted of selling a misbranded pail of lard.

He contends that the law under which he was convicted (Comp. St. 1909, ch. 33; Ann. St. 1909, secs. 9818-9840), known as the "Pure Food Law," is in contravention of the fourteenth amendment to the constitution of the United States, in that it deprives him of his property and of liberty without due process of law, and denies him the equal protection of the laws. It is also contended that the package sold was put up by a retailer, and therefore that the sale was permitted by the statute. For convenience we will consider the latter point first. The stipulation of facts recites:

"4. That on said 22d day of September, 1909, said defendants sold to one Harriet S. MacMurphy in the county of Lancaster and state of Nebraska, for use in said state of Nebraska, one pail of lard in package form, said package not having been put up by said defendants, and said package being other than canned corn, and not having any statement printed or stated on the outside of said package of the net weight or measure of the contents thereof exclusive of the container. Said package contained an article of food, to-wit, lard."

"6. The principal business of said Armour & Company at and prior to said 22d day of September, 1909, was the slaughtering of cattle, hogs, and sheep, the dressing of the meat of said animals and the production, preparation, sale and marketing of the various food productions derived from the slaughtering of said animals, among which is lard, one of the products derived from the carcasses of hogs. Said Armour & Company at and prior to the 22d day of September, 1909, sold the largest part of the output of each of its packing houses in wholesale quantities and at wholesale trade, but at all of said times said Armour & Company maintained and operated, at its packing house in South Omaha, Douglas County, Nebraska,

a retail meat market at which it sold at retail, direct to consumers, lard and meat products.

"7. The package or pail of lard above mentioned which was sold by these defendants on the 22d of September, 1909, as above stated, was put up by said Armour & Company at its packing house in South Omaha, Nebraska, and was sold by said Armour & Company to these defendants with other like packages in wholesale quantities and as a part of the wholesale trade of said Armour & Company, and said package was sold by these defendants to said Harriet S. MacMurphy in the course of their regular retail trade and as a retail sale.

"8. Said package was sold by these defendants to said Harriet S. MacMurphy not as a package of any stated or given weight or measure but simply as a 'pail of lard.' "

Section 22, ch. 33, Comp. St. 1909 (Ann. St. 1909, sec. 9839), which is the provision under which this prosecution was brought, provides: "That no person shall within this state manufacture for sale therein, or have in his possession with intent to sell, offer or expose for sale, or sell any * * * article of food * * * which is adulterated or misbranded within the meaning of this act." Section 8 of the same act (Ann. St. 1909, sec. 9825) contains a very long, involved, verbose, and awkwardly expressed exposition of the term "misbranded" as used in the act. It seems to have for its foundation the act of congress upon the same subject, but has a number of variations therefrom. So far as applies to the question here, and omitting the portions thereof which do not refer to the present controversy, it is as follows: "That for the purposes of this act an article shall also be deemed to be misbranded * * * Third. If sold for use in Nebraska and in package form, other than canned corn; if every such package, as provided and named below, does not bear a correct statement clearly printed on the outside of the main label, of the contents and also of the net weight or measure of the contents exclusive of the container, viz., all dairy products, lard, cottolene, * * *.

Provided, however, that the provision shall not apply to packages put up by the retailer, nor to packages on hand by any retailer at the time of taking effect of this act."

The argument is that, since Armour & Company operate a retail store in South Omaha and are "retailers" in respect to the traffic therein, though wholesalers and manufacturers with respect to the preparation, putting up and selling to defendant of the particular package sold by him, they must be held to be retailers for all purposes, under section 251 of the criminal code, because a penal statute may not be extended by implication beyond its express terms. It is also said: "This package was put up by Armour & Company. Armour & Company is shown by the stipulation of facts to be a retailer. Consequently, under the plain import of the words, and eliminating all straining after the supposed spirit, the act does not apply to the package in question in this case."

This argument seems to be based on the assumption that a corporation or person can act in but one capacity or engage in but one business; or else that it may, chameleon-like, change its complexion to suit the exigencies of the occasion, and adopt such a description of itself as may seem best to fit the emergency. Could it be contended that an ordinance regulating retail dealers in South Omaha could not operate on Armour & Company's retail store because, one branch of their business being wholesale, they thereby became wholesalers, or that an ordinance governing wholesalers or manufacturers could not apply to them because they are retailers? With the putting up or selling of the pail of lard, Armour & Company as retailers had nothing to do. It was Armour & Company, packers, who put up the lard in the package, and, as the stipulation recites, "it was sold * * * as a part of the wholesale trade of said Armour & Company." One might as well say that one having the right to sell goods as a merchant in a building in the ordinary course of business must also have the right to sell goods as a peddler without license or restriction, though a regulating ordi-

nance as to the latter calling was in force; or that a saloon-keeper who sells wine made from grapes grown by himself (as he may do without a license in this state) may sell all kinds of intoxicating liquors because of his right to sell such wine as a producer.

As to the contention that the act violates the fourteenth amendment: One of the principal objections made is that the law deprives defendant of the equal protection of the law because "it interposes impediments in the pursuits of one person which are not applied to the same pursuits of others under like circumstances; and it attempts to accomplish this under the mere guise of classification, when the classification is purely arbitrary and is not based on any difference which bears a just and proper relation to the attempted classification." It is asked why should a statement of the weight or measure be required upon a pail of lard, and not upon a can of oysters, or upon a can of syrup, and not upon a can of salmon, or upon a can of peaches or cherries, while peas or beans may be sold unbranded? In answer to this it may be said that it was within the power of the legislature to require all foods put up in packages to bear upon the package the net weight or measure of the contents. By the terms of the act this is required in the case of "all dairy products, lard, cottolene, or any other article used as a substitute for lard, wheat products, oat products and corn products and mixtures, prepared or unprepared; sugar, syrup and molasses, tea, coffee, canned, dried fruit." Comp. St. 1909, ch. 33, sec. 8. It is possible that experience taught the legislature that the opportunities for fraud or deception in the weight or measure of the articles embraced in this classification were greater than in the case of other products, or that the volume of trade and consumption of these articles of food was so much greater and more important than that of other articles that it was wise to include them only.

It is possible, nay even probable, that there are many other articles which should be embraced within the provi-

sions of the act, but, does the mere fact that the legisla-
ture has not included all that it might include vitiate the
law as respects those within its terms? We think not.
The fact that the legislature did not cover all articles of
food is not a just ground of complaint. As well say that
acts governing the sale of intoxicating liquors are invalid
because all other intoxicating substances are not included.
Legislation is to a large extent an evolutionary process,
and legislatures often work by piecemeal. Not in-
frequently they approach a new subject of legislation in a
timid and halting spirit, and it often takes years and many
sessions to frame legislation covering a whole subject. A
good example of this is to be found in the legislation in
this state with respect to combinations in restraint of
trade. *State v. Omaha Elevate  Co.*, 75 Neb. 637. Mr. Jus-
tice Holmes says in *Carroll v. Greenwich Ins. Co.*, 199 U.
S. 401, 26 Sup. Ct. Rep. 66: "Again, if an evil is specially
experienced in a particular branch of business, the consti-
tution embodies no prohibition of laws confined to the evil,
or *doctrinaire* requirement that they should be couched in
all-embracing terms. It does not forbid the cautious ad-
vance, step by step, and the distrust of generalities which
sometimes have been the weakness, but often the strength,
of English legislation. *Otis v. Parker*, 187 U. S. 606.
And if this is true, then in view of the possible teachings
to be drawn from a practical knowledge of the business
concerned, it is proper that courts should be very cautious
in condemning what legislatures have approved." *Heath
& Milligan Mfg. Co. v. Worst*, 207 U. S. 338, 28 Sup. Ct.
Rep. 114; *State v. Moore*, 104 N. Car. 714.

The argument as to the wisdom or lack of wisdom in
failing to include certain other classes of foods is one
which might properly have been presented to the legisla-
ture, but is not one which appeals to the court. The
classification may be, to some extent, arbitrary in its na-
ture, but it is difficult to draw the line, and there may
have been, and no doubt were, reasons appealing to the
legislative mind which are not presented here and are not

apparent to us, but which may, nevertheless, exist. The court does not sit to review the wisdom of legislative acts. Its only function in this respect is to determine whether it has acted in such a manner as to violate the constitutional provisions.

It is said, however, that the most vicious classification in the act is that which undertakes to discriminate between persons, and which makes identically the same act done by one person a crime which if done by another is perfectly innocent; that if a retailer may purchase lard in bulk and put it up in pails exactly like the one in question in this case, and sell it without any label as to weight or measure, he has committed no crime, while if this was done by a manufacturer or wholesaler the statute makes. the act a crime. This may be true, indeed under the act must be true, but does this result of necessity deprive either the retailer or the wholesaler of the equal protection of the laws? The argument made is that classification is not in itself a complete protection against attack on a statute which attempts to discriminate between different classes of persons, and that in order to sustain such a law "it must appear that the interests of the public generally as distinguished from those of a class are involved, and the means must be reasonably necessary for the accomplishment of the purpose; that the act must have a direct relation as a means to an end, and the end itself must be appropriate and legitimate; that no impediment should be interposed to the pursuits of any one, except such as are applied to the same pursuits by others under like circumstances; and no greater burdens should be laid upon one than are laid upon others in the same calling and condition. It must appear that the classification is upon some reasonable ground, some difference which bears a just and proper relation to the attempted classification, and is not a mere arbitrary selection."

Much stress is laid on the case of *Connolly v. Union Sewer Pipe Co.*, 184 U. S. 540, 22 Sup. Ct. Rep. 431, and the case of *Low v. Rees Printing Co.*, 41 Neb. 127, and

a number of other cases of undoubted force are cited as sustaining these principles. We have no quarrel with the principles. The difficulty is in their application. , Time and necessary limitations to the length of this opinion prevent setting forth all the objections urged, but among them it is said this is "a classification not based on the kind of article sold, not based on any theory that there may be greater opportunities for cheats in goods sold in package form than in sales made in bulk, or on the theory that there is greater likelihood of cheating in the sale of one kind of article than in another, but it is based solely and simply on a mere matter of personality. It cannot be defended on the theory of the public interest, because the wholesaler and the retailer are alike free to refuse to trade when and with whom they will. It cannot be justified on the theory of corporate regulation, because the wholesaler may be, and often is, a natural person, and the retailer may be, and often is, a corporation. It puts a greater burden upon one man than on another under precisely the same conditions. It puts impediments in the way of one that are not interposed in the case of the other. It offends flagrantly against every principle of equal protection of the law."

These are grave and weighty criticisms, but we are more impressed by other considerations. In our view the act is, in respect to the matter involved, practically a police regulation governing the manufacturing for sale in this state and the selling of certain kinds of food in closed packages put up by wholesalers, manufacturers, or persons other than retailers. All persons engaged in the same business—the manufacture for sale in this state or the selling of certain food products in package form put up by other than retailers—are treated alike by the statute. The fact that packages put up by the retailer are not included in this regulation we think is not material. It is very probable that the legislature ascertained that by far the greater quantity of food products put up in closed packages are prepared and sold by wholesalers, and that the

comparatively insignificant quantity put up by the re-tailer, with the opportunities for inspection and correc-tion afforded by the nearness of his customer, furnish a sufficient ground to classify and discriminate.   Further-more, it is a matter of common knowledge that foods are seldom put up in closed package form by retailers (though the stipulation recites that lard is put up and sold by re-tailers in like pails), while within the last few years there has been an immense development (much to be welcomed upon sanitary grounds) of the practice of putting up foods at the place of their preparation or manufacture in tightly closed or sealed receptacles, so that the consumer may receive the same with the liability of contamination by ex-posure to unclean handling or liability of infection entirely done away with.   This practice has grown with the de-mand of the public for better sanitary conditions, and has been met by the enterprising and intelligent manufac-turer by ingenious methods of inclosing various articles of food in different receptacles best suited for the pur-pose.

The principal object of the legislature was to protect the public from the danger of fraud caused by the absence of uniformity in the amount of goods placed within the respective packages. The legislation is of the same nature as that concerned with the prevention of fraud by the regulation of weights and measures. Mr. Freund (Freund, Police Power, secs. 273, 274) points out that statutes not infrequently prescribe that certain forms of package shall contain a fixed amount by weight and measure; that such provisions are found with regard to hay, fish, fruit, hoops, staves, etc., and that of a similar nature are stat-utes prescribing the manner in which bread shall be sold, the measures by which milk shall be sold, and other pro-visions of like character.

The protection of the public from fraud by requiring the net weight or measure of the contents of closed pack-ages to be marked upon the outside thereof is clearly within the police powers of the state.   Where the neces-

sities of life are sold to a large extent in package form, it is almost as necessary that the public should be protected against imposition by scrimping the contents of a package, as it is that it be protected against adulterated goods, or deception in quality by means of coloring, or against false weights or measures. The fraction of an ounce taken from the contents of a single package may wrong a single consumer but little, but where hundreds of thousands of packages are sent out, as is done by large concerns, the additional profit to the manufacturer or wholesaler will be correspondingly great and the temptation to lower the contents may be too much to be withstood. This is a fraud or deception against which the consumer is almost incapable of defending himself, but one which the legislature, acting for all the people, may foresee and guard against.

We think there is a reasonable difference of condition between the wholesaler or manufacturer selling such packages of food and the retailer who puts up the packages himself and sells them to his immediate customers, and that this difference furnishes a reasonable basis for classification. If in such cases short weight or short measure is used, or packages, which by artful means deceive the eye as to their contents, are put up, the ultimate consumer is usually far removed from the guilty manufacturer or wholesaler, and is practically without a remedy under the prevailing methods of the trade in this country at the present time; while, if the same act were perpetrated by the retailer from whom he purchases, the offender is within his reach and several methods of relief from further exaction are open to him.

A case nearly in point is *St. John v. New York*, 201 U. S. 633, 26 Sup. Ct. Rep. 554, in which case a statute of the state of New York by which producing and unproducing venders of milk were classified differently with respect to the sale of milk was considered. It was argued in that case, as in this, that the act of selling by members of one class was permitted, while the act of sell-

ing by members of the other class was prohibited or penalized. Mr. Justice McKenna, writing the opinion, says: "If we could look no further than the mere act of selling, the injustice of the law might be demonstrated, but something more must be considered. Not only the final purpose of the law must be considered, but the means of its administration—the ways it may be defeated. Legislation, to be practical and efficient, must regard this special purpose as well as the ultimate purpose. The ultimate purpose is that wholesome milk shall reach the consumer, and it is the conception of the law that milk below a certain strength is not wholesome, but a difference is made between milk naturally deficient and milk made so by dilution. It is not for us to say that this is not a proper difference, and regarding it the law fixes its standard by milk in the condition that it comes from the herd. It is certain that if milk starts pure from the producer it will reach the consumer pure, if not tampered with on the way. To prevent such tampering the law is framed and its penalties adjusted. As the standard established can be proved in the hands of a producing vender he is exempt from the penalty; as it cannot certainly be proved in the hands of other venders so as to prevent evasions of the law, such venders are not exempt. In the one case the source of the milk can be known and the tests of the statute applied; in the other case this would be impossible, except in few instances." See, also, *American Sugar Refining Co. v. Louisiana,* 179 U. S. 89, 21 Sup. Ct. Rep. 43; *Reymann Brewing Co. v. Brister,* 179 U. S. 445, 21 Sup. Ct. Rep. 201; *Heath & Milligan Mfg. Co. v. Worst,* 207 U. S. 338, 28 Sup. Ct. Rep. 114.

It was held in *Cox v. Texas,* 202 U. S. 446, 26 Sup. Ct. Rep. 671, that liquor sellers were not denied the equal protection of the laws because producers or manufacturers of wines were exempted, while the wines were in their hands, from the tax imposed upon other liquor dealers, though both might be selling the same kind of wine. The main argument in that case, as in this, was based upon the

decision in. *Connolly v. Union Sewer Pipe Co., supra,* and on the notion that the statute discriminated between two classes of persons.

A Georgia statute imposed a tax upon certain persons hiring men to labor outside the state, but not upon persons engaged in hiring persons to work within the state. This was held in *Williams v. Fears,* 179 U. S. 270, 21 Sup. Ct. Rep. 128, not to violate the fourteenth amendment. See, also, *Cook v. Marshall County,* 196 U. S. 261, 25 Sup. Ct. Rep. 233; *Halter v. Nebraska,* 205 U. S. 34, 27 Sup. Ct. Rep. 419; *State v. Moore,* 104 N. Car. 714.

The argument in *St. John v. New York, supra,* is that the classification is made for the purpose of aiding in the efficient administration and enforcement of the law, and that there is a proper and justifiable distinction between the two classes of dealers, considering the purposes of the law and the means to be observed to effect that purpose. And so in this case the purchaser deals with and relies upon the retailer. If the retailer puts up packages himself, and there is fraud in the quantity or weight, he knows that he is committing a fraud and is wholly responsible for it. If, on the other hand, the retailer buys packages from the wholesaler which he supposes to be genuine and honest, and sells as he buys, he has no means of knowing whether he is committing a fraud or not, and therefore packages that as such are to pass from hand to hand should be branded, so that all parties dealing with them may know that they are not guilty of fraud in so doing.

In conclusion, we adopt the views of Mr. Justice Holmes expressed in *Noble State Bank v. Haskell,* 219 U. S. 104, 31 Sup. Ct. Rep. 186: "In answering that question (whether the statute violates the fourteenth amendment) we must be cautious about pressing the broad words of the fourteenth amendment to a drily logical extreme. Many laws which it would be vain to ask the court to overthrow could be shown, easily enough, to transgress a scholastic interpretation of one or another of the great

guaranties in the bill of rights.  They more or less limit the liberty of the individual, or they diminish property to a certain extent.  We have few scientifically certain criteria of legislation, and as it often is difficult to mark the line where what is called the police power of the states is limited by the constitution of the United States, judges should be slow to read into the latter a *nolumus mutare* as against the lawmaking power.  *  *  *  It may be said in a general way that the police power extends to all the great public needs.  *Camfield v. United States,* 167 U. S. 518, 42 L. ed. 260, 17 Sup. Ct. Rep. 864.  It may be put forth in aid of what is sanctioned by usage, or held by the prevailing morality or strong and preponderant opinion to be greatly and immediately necessary to the public welfare."

The statute under consideration places all persons who sell packages of the specified products put up by other than retailers under the same restrictions, subject to like penalties and punishments, so that every person engaged in the same business is equal both with respect to burden and with respect to the protection of the law.  This being the case, it does not violate any of the provisions of the fourteenth amendment.  *Powell v. Pennsylvania,* 127 U. S. 678, 8 Sup. Ct. Rep. 992; *Barbier v. Connolly,* 113 U. S. 27, 5 Sup. Ct. Rep. 357; *Soon Hing v. Crowley,* 113 U. S. 703, 5 Sup. Ct. Rep. 730; *Missouri P. R. Co. v. Humes,* 115 U. S. 512, 6 Sup. Ct. Rep. 110.

The case was submitted to the district court upon a stipulation of facts.  Where grave questions of constitutional law are concerned involving the construction of the constitution of the state or of the fourteenth amendment to the constitution of the United States, we are reluctant to act in a case where the facts which are presented to us are only such as are agreed upon by counsel.  It has been our experience that the real facts upon which the determination of a case depends are often better arrived at by the process of examination and cross-examination of witnesses than by stipulation.  The court prefers that, where

questions of fact are involved in cases of the importance of this, they should be determined upon the testimony of witnesses, rather than by agreed statements.

The judgment of the district court is

AFFIRMED.

FAWCETT and ROSE, JJ., not sitting.