IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
December 10, 2013 Session

BEVERLY BEAL, ET AL. V. BENTON COUNTY, ET AL.

Direct Appeal from the Chancery Court for Benton County
No. 2670     Don R. Ash, Senior Judge, by designation

No. W2013-01290-COA-R3-CV - Filed January 27, 2014

This case results from a county employee's assertion that the county's decision to require some employees to contribute to their insurance premiums, while not requiring a contribution from others, violates equal protection. The trial court granted summary judgment to the county, concluding that the legislation was rationally related to a legitimate government interest. After a thorough review of the record, we affirm and remand.

Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed
and Remanded

J. STEVEN STAFFORD, J., delivered the opinion of the Court, in which DAVID R. FARMER, J., and HOLLY M. KIRBY, J., joined.

Robert T. Keeton, III and Laura A. Keeton, Huntingdon, Tennessee, for the appellants, Beverly Beal, et al.

Brandon O. Gibson, Jackson, Tennessee, for the appellees, Benton County, et al.

OPINION

I. Background

On September 27, 2012, Plaintiff/Appellant Beverly Beal filed a complaint for declaratory judgment and temporary injunction against Defendants/Appellees Benton County and the Benton County Board of Commissioners ("Benton County Commission," and together with Benton County, "Benton County"). Ms. Beal is employed by Benton County in the Benton County Court Clerk's Office. The complaint alleged that Benton County had violated equal protection principles in requiring similarly situated employees to pay different amounts for their insurance premiums. Specifically, Courthouse, Library, and other Benton

County employees were required to pay a premium amounting to eighteen percent (18%)[1] of the cost for their health insurance, while employees of the Benton County Sheriff's Department, Highway Department, and Board of Education[2] were not required to contribute any amount to the cost of their health insurance.

The complaint sought both a temporary and a permanent injunction preventing Benton County from "deducting any monies from the pay of an employee for the purpose of paying the employee's health insurance/benefits premiums, and requiring [Benton] County to pay the full premium for such affected employees, and to keep said health insurance policies in full force and effect." Further, the complaint asked that the trial court grant a declaratory judgment that Benton County "exceeded its authority by requiring only a portion of the employees to contribute monies as partial payment for their insurance benefits" and a return of all monies improperly deducted prior to the institution of the suit.

On October 10, 2012, Benton County responded in opposition to Ms. Beal's request for a temporary injunction. At some point, the case was removed to federal court, but the case was later remanded back to Benton County Chancery Court. After another case was filed in the Chancery Court with the same allegations, Ms. Beal filed a motion to consolidate. The trial court entered an order consolidating the cases on October 23, 2012. On November 2, 2012, the trial court granted Ms. Beal's request for a temporary injunction. The order also allowed that "any person may join as Plaintiff in this matter for 10 days following entry of this order." On November 7, 2012, Ms. Beal filed a motion to amend her complaint to add a number of additional Plaintiffs (together with Ms. Beal, "Appellants").[3] The trial court allowed the amendment by order of November 19, 2012. On November 30, 2012, Benton County filed a motion to dissolve the temporary injunction, arguing that the injunction was improperly granted and the lack of an injunction bond was "contrary to the Rules [of Civil Procedure]."

---

[1] The contribution was later increased to twenty-two percent (22%).

[2] Throughout the record in the trial court, this agency is referred to variously as the "Department of Education" and the "Board of Education." For purposes of clarity, we will refer to this agency as the Board of Education.

[3] The additional plaintiffs were: Sharon Armstrong, Rita Joyce Ball, Carly Bayless, Kathy Boshers, Amy Cary, Elizabeth Cooper, Arzell Douglas, Deborah Douglas, Sherry Hensley, James S. Hightower, Debbie Hollowell, Suzanne Hopper, Sheila Gaskin, Kathy Johnson, Rebecca Johnson, William David Johnson, Cindy King, Emily Leonard, Karen Lynch, Pat McLin, Donna Melton, Melissa Plant, Josephine Prince, Nelda Ridley, Christopher Rogers, Jean Rush, Michelle M. Teague, Rhonda Tippitt, Susan Tyner, Rae Lynn Verner, Rosanne Ward, Anthony Keith Weatherly, Linda Carol White, Janet Wood, and Sonya Volz.

On December 20, 2012, Senior Judge Don R. Ash was designated to hear the case by the Tennessee Supreme Court. Benton County filed a motion for summary judgment on February 25, 2013. Benton County submitted evidence that the decision to require Courthouse employees to pay insurance premiums was based on budgetary concerns; thus, Benton County argued that the distinction between unclassified employees and Sheriff's Department, Highway Department, and Board of Education employees withstands rational basis review. Specifically, Benton County submitted the affidavit of Barry Barnett, the Mayor of Benton County. Mayor Barnett stated in his affidavit that:

5.      In July 2011, the Benton County Board of Commissioners and its Budget Committee decided that budgetary concerns mandated a cap on the County Contribution to employee health insurance premiums for fiscal year 2012.

6.      This decision was made following study by the budget committee of relevant Tennessee law and was properly passed as a resolution of the Benton County Budget Committee.

7.      Therefore, Benton County did not budget the full payment of health insurance premiums of all County employees, as it had done in the past.

8.      The cap was placed at $547,786.00 per year. At the time the 2011-2012 budget was passed, each employee was responsible for paying $100/month for the employee's contribution to their health insurance premium.

9.      In July 2012, the budget committee and the Board of Commissioners again assessed the priorities of the county and the need to balance the budget and decided that the County contribution to employee health insurance would again be subject to a cap.

10.     For fiscal year 2012–2013, the budget committee and ultimately the county commission voted to cap the County contribution to health insurance premiums at $571,000.00. At the time the 2012–2013 budget was passed, each employee was responsible for paying $140/month for the employee's contribution to their health insurance premium.

11.     The amount budgeted by the county commission does not cover the full cost of each employee's health insurance premium, so the employees must contribute the

-3-

remaining portion of the premium cost if they choose to participate in the health insurance plan offered.

12. This contribution is made by each employee who participated through a payroll deduction in the amount of the remaining cost.

13. For fiscal year 2012, Benton County chose to bear approximately 82% of the cost of employee health insurance, making the employees responsible for approximately 18%.

14. For fiscal year 2013, Benton County chose to bear approximately 78% of the cost of employee health insurance, making the employees responsible for approximately 22%.

15. There was no discriminatory motive behind the decision to make County employees responsible for part of the cost of their health insurance premiums.

16. Benton County's decision to cap the contribution to employee health insurance premiums was directly and casually related to budgetary concerns and the financial situation of the County.

17. Following the decision of the County Commissioner in 2011 to begin deducting health insurance premiums from the paychecks of classified employees of the Sheriff Department, one deputy, who is protected by the Tennessee County Sheriff[']s Civil Service Law of 1974, filed a lawsuit in Benton County Chancery Court to stop the payroll deduction. That case is still pending in Benton County Chancery Court, but all payroll deductions for sheriff[']s civil service employees have ceased under a restraining order, which has been in place since November 2011.[4] However, deductions are being made for employees who are not covered by the Sheriff[']s

---

[4] The injunction preventing Benton County from deducting insurance premiums from the paychecks of Sheriff's Department employees has evidently been dissolved. According to Benton County's brief, the Chancery Court of Benton County entered an order on May 20, 2013, ruling that Benton County could deduct insurance premiums from the paychecks of Sheriff's Department employees, notwithstanding the language of the Tennessee County Sheriff's Civil Service Law, Tennessee Code Annotated Section 8-8-404, *et. seq*. At oral argument, counsel for Benton County asserted that no appeal had been filed in that case, that the Chancery Court's order had become final, and that deductions were now being taken from Sheriff's Department employees' paychecks. Appellants do not dispute these allegations.

Civil Service Law, including the Sheriff, the Chief Deputy, and the jail kitchen workers.

18. [Appellants] are not covered by civil service protections.

19. The Benton County Highway Department and Benton County Board of Education have budgets separate from other Benton County entities such as the Library, Courthouse, and Sheriff Department.

20. Employees of the Benton County Highway Department and the Board of Education do not have payroll deductions for insurance premiums because these departments allocate funds within their budget at their own discretion.

Benton County also filed a Statement of Undisputed Facts, which largely tracked the above affidavit. Appellants responded in opposition to the motion on March 6, 2013, asserting that discovery had not been completed; thus, Appellants argued that summary judgment was inappropriate. On the same day, Appellants also filed a response to Benton County's motion to dissolve the temporary injunction. On April 11, 2013, Appellants responded to Benton County's Statement of Undisputed Facts. Relevant to this appeal, Appellants denied that the distinction between employees was not based on a discriminatory motive. In addition, with regard to the allegation that "[t]he Benton County Highway Department and Benton County Board of Education have budgets separate from other Benton County entities," Appellants stated that: "All offices or entities are in the county approved budget and the county has final approval of all office or entity budgets."

To support this allegation, the Appellants relied on the deposition testimony of Mayor Barnett, and Ken Berry, M.D., a member of the Benton County Board of Commissioners. In relevant part, Mayor Barnett testified:

Q: Now, as far as the employees that have had deductions made for portions of their health insurance premium, why were those employees chosen out of the five hundred and six total employees?

*    *    *

A: . . . . The [Board] of Education is under a negotiated contract through 2014, so their insurance premiums were pretty much set through 2014 through a negotiated contract.

The highway department is under the Uniform Highway

Act[,] which restricts them and gives a lot of leeway on what insurance can be taken out. . . . [A]nd the sheriff's department, we do have some leeway on the amount of insurance that we give them.

But that's the reason why the highway and the . . . [board] of education I felt like was not included.

Q: The [board] of education, all the teachers are employees of Benton County.

A: They are paid through the school system and are salaried by Benton County.

Q: The highway department, their employees are employees of Benton County.

A: Correct.

Q: They are subject to the same handbook, as the courthouse employees . . . .

A: Correct.

Q: . . . . The [board] of education is not a special school district. It relies upon Benton County to set the tax rate to fund that budget; correct?

A: Correct.

Q: The highway department, same thing, it relies upon Benton County to set the tax rate to fund that department.

A: Correct.

Dr. Berry testified similarly:

Q: Okay. Now, of course, this lawsuit is over the health insurance and the deduction of the premiums. How was it determined to deduct a portion of the premium from the particular employees that are having those deductions made or

were having those made?

A: The budget committee always tries to budget—to balance the budget without a tax increase, and in order to do that, you have to make cuts in various places. And when we had made all the cuts that seemed logically possible in every other place, we still were not at the point of having a balanced budget. The employees in Benton County currently—or at that time had 100 percent of their health insurance benefits paid by the county, and the budget committee discussed this and studied this at length. There were ideas bandied about, ranging from maybe a 5 percent cut in their health insurance benefits up to a 50 percent cut. And the more we talked and kind of whittled down the options, we—we decided on an option that wouldn't be too painful for the employees but yet at the same time would get us a balanced budget. And at the time I think that turned out to be roughly an 18 percent figure, so that they would pay 18 percent of their health insurance premiums, and the county would pay the other 82 percent.

So that's—that was the final thing that came about.

Q: Okay. Well, why were the members of the sheriff's department and the courthouse employees and library singled out from the other employees of Benton County?

A: They were not singled out.

Q: Okay. Why — Let me back up. The teachers are employees of Benton County; correct?

A: Not really. And that's -- this —this— we're getting into a very complicated, convoluted part of county/state government that it will take me a few minutes to explain.

Q: Okay.

A: The county commission has the authority to affect the benefits of some employees and we do not have the authority to affect the benefits of other employees.

Q: Okay. Are the teachers an employee of Benton County?

\* \* \*

A: Their check is issued by Benton County.

Q: Okay. All right. And they are a class of employees that are eligible for healthcare benefits; correct?

\* \* \*

A: To the best of my knowledge, that's correct.

Q: The highway department, those employees are employees of Benton County.
A: Yes.

Q: Why were benefits not withheld from the teachers and the highway department?

A: Employees of the board of education are hybrid county employees in that we don't have a lot of say over the management of their benefits, salaries, or any of that.
    The director of schools and the State of Tennessee have almost all authority over everything that happens for some — for an employee of the school system. The budget committee was aware from day one that we could not affect their benefits because of the way the law is written. They are, in reality, a state employee, even though Benton County cuts their check, because we have virtually zero say so in their benefits or anything else concerning employees of the school system.
    The highway department is also a hybrid department in that the State mandates many, many things about the highway department, including their budget, that we have no say so over at all, and it's actually a more complicated setup than the school system.
    We -- we believed from day one that we could not affect the benefits of the highway department employees. That was

relayed to us by the mayor's office, by the CTAS[5] representative that we — we could not reach within that budget and affect their benefits.

* * *

Q: Okay. Now, when we were talking about the budgetary process, you said the department heads come and bring what their needs and wants are to the budget committee. Did the director of schools bring a budget to the budget committee?

A: Yes.

Q: And did the highway department superintendent bring a budget to the budget committee?

A: Yes. They both brought their budget recommendations to us.

Q: And the county sets the tax rate that funds those budgets; correct?

A: Yes.

Q: Now, as far as insurance, each employee of Benton County that works forty hours a week and is classified as full time is eligible for insurance coverage; correct?

A: To the best of my knowledge, that's correct.

Q: And that's in y'all's handbook.

A: To the best of my knowledge, that's correct.

Q: And there's just one handbook that covers all employees.

---

[5] The acronym "CTAS" stands for the County Technical Assistance Service, "a state-run entity tasked with assisting counties in their operations." *Decatur County v. Vulcan Materials Co.*, No. W2001-00858-COA-R3-CV, 2002 WL 31786985, at *3 (Tenn. Ct. App. December 12, 2002) (perm. app. denied May 19, 2003).

A: I'm not sure if the department of schools has a different handbook or if the highway department has a separate handbook. I don't know for sure.

Q: Okay. Since the [board] of education and the highway department have their budget approved by the county, why was the decision made that only these certain employees would have their health benefits cut?

A: The county commission has the authority to do some things and we do not have the authority to do other things and so we did the things that we had the authority from the State of Tennessee to do.

Q. You would agree with me that everyone that receives a paycheck from Benton County that works forty hours a week and is classified as a full-time employee is an equal employee of Benton County.

\* \* \*

A: I'm—I'm not sure I agree with that.

Q: Okay. What is your basis for disagreement?

A: Well, as I stated previously, some employees fall under different guidelines than other employees, and that makes them different.

Q: What guidelines are different for the highway department and for the [board] of education?

A: [W]ell, there's—there's an entire separate section of the Tennessee code dealing with road departments, and the road department falls under that section. And in many ways highway department employees are different than board of education employees. They're different in many, many ways, including this way.

Q: Well, as far as the highway department employees, they're

-10-

paid by Benton County; correct?

A: That's correct.

Q: Their budget, that operation is controlled by the county; correct?

A: Their budget is approved by the county commission.

* * *

Q: Was there any discussion of the fact that we're taking a portion of the premium from certain employees, but we're not taking it from other employees?

A: Yes, that was discussed.

Q: Okay. And what was the nature of that discussion?

A: Well, it was a long, drawn-out discussion because we all wanted to do everything by the law and as fairly as possible. We knew that because of state law that we could not ask for the board of education employees or the road commission employees or the Benton County Electric System employees to contribute a little bit to paying their health premiums, and so in order to try to be as fair as possible, we sent a — a strongly worded letter to the department heads of those three, asking them to please consider allowing their employees to make that contribution so t hat the other employees wouldn't be the only ones having to.

All three department heads refused to do that. And, again, we didn't feel like the cut that we were making was an egregious cut. We weren't cutting them 25 percent or 50 percent or 30 percent.

We were asking them to contribute 18 percent, and the county would contribute the other 82 percent, so — but that was discussed at length because we felt like it should be discussed.

Q: Okay. And the decision was then made to deduct from the courthouse employees, the library board, and the various

employees that have a part of their premium deducted from their check, that those employees are different from the highway department and the [board] of education.

A: The budget committee decided to deduct 18 percent of the health insurance premium from every single employee that we had the authority to deduct it from.

Q: And is the basis that you're saying that they are different that they receive some state and federal funds that go into that budget?

A: The [board] of education and the highway department receive state and federal funds that other departments do not receive, and they also fall under additional bodies of state law and perhaps federal law. I'm not sure about that.

But they fall under separate bodies of state law that give their department heads extra powers and tie the county commission's hands in other—other ways.

Q: It does not prevent the county commission from taking the tax revenue monies and allocating them as they see fit, though, does it?

* * *

A: It does actually.

Q: Okay. In what basis?

A: Well, the highway department has a five-year maintenance of effort that we have—we have to fund them at least what we funded them for the average of the last five years, and if we do not do that, for every dollar we don't fund them, the State takes a dollar from them.

And we also—the highway superintendent has much more autonomy as a department head than other department heads, like the assessor of property or the mayor even, and he can make decisions that we have no authority to change.

Q: That's in regard to spending State and federal monies.

A: That's in regards to spending his money as he sees fit.

The parties held a telephonic hearing with the trial court on April 18, 2013.[6] At the conclusion of the hearing, the trial court stated that it would consider the submissions of both parties, but that it was inclined to grant Benton County's motion for summary judgment. On April 29, 2013, the trial court entered an order granting summary judgment to Benton County. Specifically, the trial court stated:

> [Appellants'] Complaints contain no allegation that the [Appellants] belong to any protected class of individuals, based on their race, alienage status, or national origin. It is clear employer-funded health insurance is not a fundamental constitutional right. *See, e.g.* ***Dunn v. Blumstien***, 405 U.S. 330 (1972) (the right to vote is a fundamental right); ***Shapiro v. Thompson***, 394 U.S. 618 (1960) (the right to interstate travel is fundamental); ***Skinner v. Oklahoma ex rel. Williamson***, 316 U.S. 535, 541 (1942) (the right to procreate is fundamental). Thus, because no fundamental right or suspect class is alleged, the Court must consider [Appellants'] claim and [Benton] County's resolution under the rational basis test. Under this test, the resolution providing for employee contribution to health insurance premiums will not stand only if it is shown to be totally unrelated to any combination of legitimate purposes. The decision of Benton County to cap the contribution to employee health insurance premiums was directly and causally related to budgetary concerns and the financial situation of the County. The [Appellants] ha[ve] been unable to refute the facts alleged by [Benton County]. The Motion for Summary Judgment is granted.

---

[6] During the course of the litigation in the trial court, counsel for the Appellants asked Benton County to submit to them a copy of the contract between Benton County and the Benton County Board of Education/teachers. As of the telephonic hearing on Benton County's summary judgment motion, however, Benton County had not disclosed a copy of the contract to the Appellants. Although Appellants raised this issue to the trial court, it appears that Appellants have abandoned this argument on appeal; Appellants' brief contains no argument that summary judgment was inappropriate because discovery was not yet completed. Thus, this issue is waived. *See* Tenn. R. App. P. 13(b) (noting that only those issues presented for review will be considered by the appellate court).

From this order, Appellants appeal, raising a single issue, as taken from their brief:

> Whether the trial court erred in granting the Motion for Summary Judgment by finding that Benton County's practice of charging employees in the Courthouse for health insurance premiums when the County did not charge other employees of the same class (full time employees) for health insurance premiums was not violative of equal protection?

## II. Standard of Review

A trial court's decision to grant a motion for summary judgment presents a question of law. Our review is therefore *de novo* with no presumption of correctness afforded to the trial court's determination. ***Bain v. Wells***, 936 S.W.2d 618, 622 (Tenn. 1997). This Court must make a fresh determination that the requirements of Tenn. R. Civ. P. 56 have been satisfied. ***Abshure v. Methodist Healthcare-Memphis Hosps.***, 325 S.W.3d 98, 103 (Tenn. 2010).

When a motion for summary judgment is made, the moving party has the burden of showing that "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Tenn. R. Civ. P. 56.04. According to the Tennessee Legislature:

> In motions for summary judgment in any civil action in Tennessee, the moving party who does not bear the burden of proof at trial shall prevail on its motion for summary judgment if it:
>
> (1) Submits affirmative evidence that negates an essential element of the nonmoving party's claim; or
>
> (2) Demonstrates to the court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim.

Tenn. Code Ann. § 20-16-101 (effective on claims filed after July 1, 2011).

## III. Analysis

The issue in this case concerns whether a decision to deduct insurance premiums from

-14-

some employees' salaries, while providing the same insurance to other employees with no salary deduction violates equal protection. The Equal Protection Clause of the United States Constitution provides that "No state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Tennessee Constitution offers similar protection. According to the Tennessee Supreme Court in *Brown v. Campbell County Bd. of Educ.*, 915 S.W.2d 407 (Tenn.1995):

> In two separate provisions, applicable in different circumstances, our state Constitution provides an equal protection guarantee. *State v. Tester*, 879 S.W.2d 823, 827 (Tenn.1994); *Tennessee Small School Sys. v. McWherter*, 851 S.W.2d 139, 152 (Tenn.1993). The first provision found in Article 1, Section 8, known as the "law of the land" clause, provides that individuals shall not be deprived of
>
>> liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of . . . life, liberty or property but by the judgment of . . . peers or the law of the land.
>
> Tenn. Const. Art. I, § 8. The second relevant Tennessee constitutional provision, Article XI, Section 8, reads in part:
>
>> General laws only to be passed.—The Legislature shall have no power to suspend any general law for the benefit of any particular individual, nor to pass any law for the benefit of individuals inconsistent with the general laws of the land; nor to pass any law granting to any individual or individuals, rights, privileges, immunitie, [immunities] or exemptions other than such as may be, by the same law extended to any member of the community, who may be able to bring himself within the provisions of such law.

*Brown*, 915 S.W.2d at 412–13. Our Supreme Court has "consistently held that the state equal protection guarantee is co-extensive with the equal protection provisions of the . . . U.S. Constitution." *Calaway ex rel. Calaway v. Schucker*, 193 S.W.3d 509, 518 (Tenn. 2005) (citing *McWherter*, 851 S.W.2d at 152). Accordingly, both the United States and Tennessee Constitutions "guarantee equal privileges and immunities for all those similarly situated."

-15-

***McWherter***, 851 S.W.2d at 152.

Further, in analyzing equal protection challenges, the Tennessee Supreme Court has followed the analytical framework developed by the United States Supreme Court. *See* ***Brown***, 915 S.W.2d at 413. Under this framework, depending on the nature of the right asserted, the Court is to apply one of three standards of scrutiny: (1) strict scrutiny, (2) heightened scrutiny, and (3) reduced scrutiny, applying the rational basis test. *See* ***State v. Tester***, 879 S.W.2d at 828; ***McWherter***, 851 S.W.2d at 153.

The parties in this case agree that the equal protection challenge at issue is subject to the rational basis level of scrutiny. The "rational basis test" has been described by the Tennessee Supreme Court as follows:

> The concept of equal protection espoused by the federal and our state constitutions guarantees that "all persons similarly circumstanced shall be treated alike." Conversely, things which are different in fact or opinion are not required by either constitution to be treated the same. "The initial discretion to determine what is 'different' and what is 'the same' resides in the legislatures of the States," and legislatures are given considerable latitude in determining what groups are different and what groups are the same. In most instances the judicial inquiry into the legislative choice is limited to whether the classifications have a reasonable relationship to a legitimate state interest.

***State v. Tester***, 879 S.W.2d 823, 828 (Tenn.1994)(quoting ***Tennessee Small School Systems v. McWherter***, 851 S.W.2d at 153)(internal citations omitted)). Further, this Court has previously described rational basis as a "relaxed" standard of review. *See* ***Millennium Taxi Service, L.L.C. v. Chattanooga Metropolitan Airport***, No. E2008-00838-COA-R3-CV, 2009 WL 1871927, at *6 (Tenn. Ct. App. 2009) (citing ***Harrison v. Schrader***, 569 S.W.2d 825, 825 (Tenn.1978)). "This inquiry employs a relatively relaxed standard reflecting the Court's awareness that the drawing of lines that create distinctions is peculiarly a legislative task and an unavoidable one." ***Harrison***, 569 S.W.2d at 825. In considering this relaxed standard of review, the United States Supreme Court has further stated that a challenge to the constitutionality of a statute reviewed under the rational basis standard "is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." ***F.C.C. v. Beach Communications, Inc.***, 508 U.S. 307, 313, 113 S.Ct. 2096 (1993). "This standard of review is a paradigm of judicial restraint." ***Id.***

This Court has previously utilized the United States' Supreme Court's standard for challenging the constitutionality of economic legislation as a violation of due process in analyzing similar legislation as a violation of equal protection. **Millennium Taxi Service**, 2009 WL 1871927, at *6 (citing **Pension Benefit Guar. Corp. v. R.A. Gray & Co.**, 467 U.S. 717, 729, 104 S.Ct. 2709 (1984)). According to the United Stated Supreme Court:

> It is by now well established that legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and that the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way.

**Millennium Taxi Service**, 2009 WL 1871927, at *6 (citing **Pension Benefit**, 467 U.S. at 729). Thus, economic legislation has a presumption of constitutionality. *See also* **Ogilvie v. Hailey**, 141 Tenn. 392, 210 S.W. 645, 646 (Tenn. 1919) ("Every intendment is in favor of the statute and against the attack[.]"). As explained by the United States Supreme Court:

> On rational-basis review, a classification in a statute . . . comes to us bearing a strong presumption of validity, *see* **Lyng v. Automobile Workers**, 485 U.S. 360, 370, 108 S.Ct. 1184, 1192, 99 L.Ed.2d 380 (1988), and those attacking the rationality of the legislative classification have the burden "to negative every conceivable basis which might support it," **Lehnhausen v. Lake Shore Auto Parts Co.**, 410 U.S. 356, 364, 93 S.Ct. 1001, 1006, 35 L.Ed.2d 351 (1973) (internal quotation marks omitted). *See also* **Hodel v. Indiana**, 452 U.S. 314, 331–332, 101 S.Ct. 2376, 2387, 69 L.Ed.2d 40 (1981). Moreover, because we never require a legislature to articulate its reasons for enacting a statute, it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature. **United States Railroad Retirement Bd. v. Fritz**, *supra*, 449 U.S., at 179, 101 S.Ct., at 461. *See* **Flemming v. Nestor**, 363 U.S. 603, 612, 80 S.Ct. 1367, 1373, 4 L.Ed.2d 1435 (1960). Thus, the absence of " 'legislative facts'" explaining the distinction "[o]n the record," . . . has no significance in rational-basis analysis. *See* **Nordlinger v. Hahn**, 505 U.S. 1, 15, 112 S.Ct. 2326, 2334, 120 L.Ed.2d 1 (1992) (equal protection "does not demand for purposes of rational-basis review that a legislature or governing decisionmaker actually articulate at any time the purpose or

rationale supporting its classification"). In other words, a legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data. *See **Vance v. Bradley***, *supra*, 440 U.S., at 111, 99 S.Ct., at 949. *See also **Minnesota v. Clover Leaf Creamery Co.***, 449 U.S. 456, 464, 101 S.Ct. 715, 723, 66 L.Ed.2d 659 (1981). "'Only by faithful adherence to this guiding principle of judicial review of legislation is it possible to preserve to the legislative branch its rightful independence and its ability to function.'" ***Lehnhausen***, *supra*, 410 U.S., at 365, 93 S.Ct., at 1006 (quoting ***Carmichael v. Southern Coal & Coke Co.***, 301 U.S. 495, 510, 57 S.Ct. 868, 872, 81 L.Ed. 1245 (1937)).

***Beach Communications***, 508 U.S. at 314–15; *see also **Dandridge v. Williams***, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970) (classification does not violate equal protection simply because it "is not made with mathematical nicety or because in practice it results in some inequality") (internal quotation marks omitted); ***Metropolis Theatre Co. v. Chicago***, 228 U.S. 61, 69–70, 33 S.Ct. 441, 443, 57 L.Ed. 730 (1913) ("The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific"); ***Heath & Milligan Mfg. Co. v. Worst***, 207 U.S. 338, 354, 28 S.Ct. 114, 119, 52 L.Ed. 236 (1907) ("logical appropriateness of the inclusion or exclusion of objects or persons" and "exact wisdom and nice adaptation of remedies are not required").

This Court has recently considered several equal protection challenges that were reviewed under the rational basis standard. First, in ***Dr. Pepper Pepsi-Cola Bottling Co. of Dyersburg, LLC v. Farr***, 393 S.W.3d 201 (Tenn. Ct. App. 2011), this Court upheld the constitutionality of a bottling tax that treated in-state manufacturers differently than out-of-state manufacturers. ***Id.*** at 210. In upholding the legislation, the Court noted:

> "It is well settled that the equal protection clause does not require absolute equality from the State and its political subdivisions." ***Posey v. City of Memphis***, 164 S.W.3d 575, 578–79 (Tenn. Ct. App. 2004) (citing ***Gray's Disposal Co. v. Metro. Gov't of Nashville***, 122 S.W.3d 148, 162–63 (Tenn. Ct. App. 2002)). Equality between differently situated classes is not guaranteed, as the equal protection clause requires only "'that persons similarly situated be treated alike.'" ***Id.*** at 579 (quoting ***Gallaher***, 104 S.W.3d at 461). Thus, as a threshold determination, a court must first consider whether classes are

"similarly situated so as to warrant application of the protection of the equal protection clause." *Id.* If similarly situated, but differentially treated, the court must then determine whether a rational basis exists for such differential treatment. *Id.*; *see also Phelps v. Tenn. Dept. of Corr.*, No. M1999-02109-COA-R3-CV, 2000 WL 1038115, at *2 (Tenn. Ct. App. July 28, 2000) ("While the equal protection clause states that all persons similarly situated must be treated alike, the legislature may treat a class of persons differently so long as the classification has a rational relationship to a legitimate state interest."). Again, under a rational basis analysis, " '[i]f any possible reason can be conceived to justify the classification, or if the reasonableness be fairly debatable,' then the legislation will not be struck down." *Admiralty Suites and Inns, LLC v. Shelby County*, 138 S.W.3d 233, 240 (Tenn. Ct. App. 2003) (noting that the constitutionality of a tax statute is analyzed using the rational basis standard) (quoting *Estrin v. Moss*, 221 Tenn. 657, 430 S.W.2d 345, 349 (1968)).

*Dr. Pepper Bottling Co.*, 393 S.W.3d at 209–10. Thus, the Court concluded that evidence of differential treatment of out-of-state and in-state manufacturers, did not, *ipso facto*, lead to the conclusion that there was an equal protection violation. *Id.* at 210.

In another case, *Millennium Taxi Service, L.L.C. v. Chattanooga Metropolitan Airport*, No. E2008-00838-COA-R3-CV, 2009 WL 1871927(Tenn. Ct. App. 2009), this Court also upheld regulations that provided for differential treatment for registered and unregistered taxis. Under the regulation, registered taxis were allowed to wait for passengers at the Chattanooga Metropolitan Airport ("the Airport") in designated curbside areas outside of baggage claim. Registered taxis were subject to various age and inspection requirements to insure that the taxis are in good working order. Companies operating registered taxis are subject to fines for violating the regulations. Registration of a taxi under the regulations is voluntary. Those taxis that are not registered, however, are not permitted to wait for customers in the designated area. In effect, the unregistered taxis are "effectively removed from access to incoming passengers unless the passengers ha[d] made advance reservations to be picked up by such a vehicle." *Id.* at *7.

A company that owned unregistered taxis challenged the regulations, arguing that the regulations violated equal protection in that they prevented only unregistered taxis, and not other "private vehicles, buses, and other commercial vehicles, [or] registered taxicabs" from picking up passengers curbside. *Id.* The Court first noted that the question of whether a rule,

law, or regulation is violative of equal protection involves a two part inquiry. First, "does the challenged legislation have a legitimate purpose[.]" *Id.* at *7 (citing *Western & Southern Life Insurance Company v. State Board of Equalization of California*, 451 U.S 648, 668, 101 S.Ct. 2070 (1981)). Second, "was it reasonable for the law makers to believe that use of the challenged classification would promote that purpose." *Millennium Taxi Service*, 2009 WL 1871927, at *6 (citing *Western & Southern Life Insurance*, 451 U.S at 668). The Court first concluded that the challenged legislation served a legitimate state purpose, concluding:

> [I]t cannot be convincingly argued that [the Airport's] cited objectives—controlling access to the limited curbside, effectively managing the flow of vehicles and pedestrians in the area, ensuring quality control and customer satisfaction with ground transportation services originating from the airport, and presenting a favorable image of the airport—are not legitimate legislative purposes.

*Millennium Taxi Service*, 2009 WL 1871927, at *6.

The question, then, was whether the Airport "reasonably applied the Regulations to non-registered taxis to further these purposes." *Id.* The Court concluded that it did. First, the Court noted that the regulations provided that any non-registered vehicle, taxi or otherwise, was not permitted to park in the designated area. *Id.* at *7. Thus, the taxi companies argument that the regulations only affected unregistered taxis was "simply not true." *Id.* The Court then concluded that the Airport's decision to restrict access to all unregistered vehicles was "reasonably related to their legitimate purpose of presenting incoming passengers with transportation options, whether they be taxis, limousines, or other vehicles, from providers that are known to [the Airport] to have vehicles that are relatively new, clean, and in good repair-conditions imposed upon all permitted commercial ground transportation vehicles." *Id.* The Court noted that the Airport's "objectives of controlling access to the limited curbside and regulating the flow of traffic outside the terminal are reasonably met by simply limiting the number of vehicles in the area." *Id.* at *8. According to the Court, the fact that the Airport chose to give a preference to one group of permitted vehicles to meet its goal to regulate the flow of traffic did not make the regulations violative of equal protection. Indeed, the Court noted that: "A classification having some reasonable basis 'is not unconstitutional merely because it results in some inequality.'" *Id.* (citing *Harrison v. Schrader*, 569 S.W.2d 825, 825 (Tenn.1978)).

The parties in this case apparently agree that the unclassified employees who are subject to paying a portion of their insurance premiums and the employees of the Highway

-20-

Department and the Board of Education[7] are "similarly situated so as to warrant application of the protection of the equal protection clause." *Dr. Pepper Bottling Co.*, 393 S.W.3d at 209–10. Thus, we must determine whether a rational basis exists for the legislation that results in the disparate treatment. *Id.* To do so, we must consider the two part inquiry outlined in *Millennium Taxi Service*: (1) whether the challenged legislation has a legitimate purpose; and (2) whether it was reasonable for the law makers to believe that use of the challenged classification would promote that purpose. *See Millennium Taxi Service*, 2009 WL 1871927, at *6.

Turning to the facts in this case, it is clear that the challenged legislation in this case has a legitimate purpose. *See id.* As evidenced by both Benton County's Statement of Undisputed Facts and the deposition testimony of Mayor Barnett and Dr. Berry, the Benton County Commission determined that a cap on the county's contribution to employee insurance benefits was needed in order to remedy a budget shortfall, rather than having to resort to raising taxes. The Appellants do not dispute that the purpose of the cap on contributions was in order to "balance the budget." The Benton County Commission, as the agency in charge of the budget for Benton County, clearly has an interest in remedying a budgetary shortfall. Accordingly, like in *Millennium Taxi Service*, Appellants "cannot . . . convincingly argue[] that [Benton County's] cited objective[]"—to remedy a budget shortfall without a tax increase— is not a legitimate legislative purpose. *Millennium Taxi Service*, 2009 WL 1871927, at *6.

Thus, we come to the second inquiry—whether "it [was] reasonable for the law makers to believe that use of the challenged classification would promote that purpose." *Millennium Taxi Service*, 2009 WL 1871927, at *6 (citing *Western & Southern Life Insurance*, 451 U.S at 668). We conclude that it was. First, we note that the situation in this case is similar to the situation presented in *Millennium Taxi Service*. In *Millennium Taxi Service*, the Airport had a legitimate purpose in controlling access to the limited curbside and controlling the flow of traffic. In order to effectuate that purpose, this Court concluded that the Airport was reasonable to limit access to the curbside to only authorized vehicles. *See Millennium Taxi Service*, 2009 WL 1871927, at *8. In this case, the Benton County Commission was faced not with limited curbside, but with limited funds. The Benton County Commission was required to determine how to meet a budget shortfall, either through budget cuts or through increased taxes. Based on the undisputed deposition testimony in the record, the Benton County Commission's decision to cap contributions to

---

[7] As previously discussed, Benton County was not, for a time, deducting insurance premiums from the paychecks of Sheriff's Department employees; however, during the pendency of this appeal, deductions resumed from the paychecks of these employees. Therefore, for purposes of this appeal, we need only consider the lack of deductions from Highway Department and Board of Education employees.

employee benefits solved this issue and effectively "balanced the budget." As previously discussed, economic legislation comes to this Court with a presumption of validity. *See Millennium Taxi Service*, 2009 WL 1871927, at *6 (citing *Pension Benefit*, 467 U.S. at 729). Thus, the decision to cap benefits was "rationally related" to the legitimate legislative interest of balancing the budget. *Phelps v. Tenn. Dept. of Corr.*, No. M1999-02109-COA-R3-CV, 2000 WL 1038115, at *2 (Tenn. Ct. App. July 28, 2000) (holding that no equal protection violation exists "so long as the classification has a rational relationship to a legitimate state interest.").

Further, the record supports the County Commission's decision to treat unclassified county employees disparately from employees of the Board of Education and the Highway Department. According to Benton County's Statement of Undisputed Facts and Mayor Benton's affidavit, the decision to excuse employees of the Highway Department and the Board of Education from this legitimate budgetary decision was based on the Benton County Commission's belief that the Highway and Education "departments allocate funds within their budget at their own discretion." Specifically, Benton County's evidence shows that the classification was based on the reasonable belief that the Benton County Commission had no authority to affect the benefits of employees of the Highway Department and the Board of Education. The evidence supports Benton County's assertion that Appellants could not establish that the legislation, and the resulting classification, were not rationally related to a legitimate government interest. Therefore, Benton County submitted a properly supported motion for summary judgment, showing that the Appellants' evidence was "insufficient to establish an essential element of the nonmoving party's claim." Tenn. Code Ann. § 20-16-101. Consequently, the burden shifted to the Appellants to "set forth specific facts showing that there is a genuine issue for trial." Tenn. R. Civ. P. 56.06.

The Appellants, however, assert that they met this burden and that summary judgment was, thus, inappropriate. To support their assertion, the Appellants point to Dr. Berry's testimony that the Benton County Commission had authority to approve of the budgets of both the Highway Department and the Board of Education. However, this characterization fails to consider the remainder of Dr. Berry's testimony or the testimony of Mayor Barnett. Indeed, both Dr. Berry and Mayor Barnett testified repeatedly, and without any countervailing evidence from the Appellants, that the Benton County Commission did not have the authority to change the benefits of Highway Department and Board of Education employees due to: (1) the Benton County Commission's understanding, based on research and counsel with Benton County attorneys and CTAS, that state law gave the heads of these agencies increased discretion over the benefits of these agencies' employees; and (2) a contract with the Board of Education that determined the funding and benefit amounts to that agency until 2014; and (3) a state law requiring that a county fund the Highway Department at a historical level. The Appellants offered no proof to dispute

-22-

this testimony, nor did it raise any issue as to either witness's credibility or competency to testify on this issue. Accordingly, this testimony undisputedly shows that the Benton County Commission chose to require only some of Benton County employees' to pay a portion of the cost of their insurance premiums based on its research, which indicated that the Benton County Commission had no authority to require the employees of the Highway Department and the Board of Education to make these payments.

The Appellant, however, asserts that Benton County offered no law or the contracts at issue to show that the Benton County Commission was correct in its belief that it could not affect the benefits of the employees of the Highway Department or the Board of Education. However, as previously discussed, "a legislative choice . . . may be based on **rational speculation unsupported by evidence or empirical data. *Beach Communications***, 508 U.S. at 314–15 (emphasis added) (citing ***Vance***, 440 U.S., at 111). The Appellants have offered no law or facts which tend to show that it was irrational or unreasonable for the Benton County Commission to conclude that they had no authority to modify the benefits of employees of the Highway Department and the Board of Education. Again, it is the Appellants who have the burden to "to negative every conceivable basis which might support [the challenged legislation]." ***Beach Communications***, 508 U.S. at 314–15 (quoting ***Lehnhausen***, 410 U.S. at 364 (internal quotation marks omitted)). Appellants have simply offered no evidence to negate the deposition testimony establishing that the Benton County Commission declined to deduct insurance premiums from Highway Department and Board of Education employees because its research indicated that it had no authority to do so. Thus, the deposition testimony was sufficient to show that the Benton County Commission had a reasonable basis for treating Highway Department and Board of Education employees differently than other county employees. Under these circumstances, we must conclude that the Appellants failed to meet their burden to set forth specific facts showing that the Benton County Commission's decision to treat these employees disparately was unreasonable or not rationally related to a legitimate government interest. We agree that the classification in this case results in unequal treatment of various county employees. However, simply because a classification "results in some inequality" does not mean that the classification violates equal protection. ***Dandridge v. Williams***, 397 U.S. at 485; *see also **Millennium Taxi Service***, 2009 WL 1871927, at *8 (citing ***Harrison***, 569 S.W.2d at 825). Under these circumstances, the trial court did not err in granting summary judgment to Benton County.

## IV. Conclusion

The judgment of the Chancery Court of Benton County is affirmed. This cause is remanded to the trial court for all further proceedings as may be necessary and are consistent with this Opinion. Costs of this appeal are taxed to Appellants Beverly Beal, et al., and their

surety.

                              _____
                              J. STEVEN STAFFORD, JUDGE